Dennis M. Moskal, Esq., CFE
Law Offices of Dennis M. Moskal, LLC
500 Grant Street, Suite 2900
Pittsburgh, Pennsylvania 15219
(412) 992-0948
dennis@harassment-doctor.com

---

### IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KAREN PAULLET,

    Plaintiff,     CASE NO. _____

v.

AMERICAN PUBLIC UNIVERSITY
SYSTEM,

    Defendant.

### COMPLAINT IN CIVIL ACTION

Plaintiff, Karen Paullet, by and through her counsel, Dennis M. Moskal, Esq., files the instant Complaint in Civil Action against Defendant, AMERICAN PUBLIC UNIVERSITY SYSTEM, and avers as follows:

### The Parties

1. PLAINTIFF, KAREN PAULLET (hereinafter "PLAINTIFF"), is an adult individual, who resides at 114 Roswin Drive, Pittsburgh, Allegheny County, Pennsylvania 15226.

2. Defendant, AMERICAN PUBLIC UNIVERSITY SYSTEM (hereinafter "Defendant-Employer"), is a West Virginia corporation with offices located at 111 West Congress Street, Charles Town, Jefferson County, West Virginia 25414. Defendant-Employer employs approximately 3,000 nationwide.

### Claims

3. PLAINTIFF, who is a professor at the American Public University System (APUS), files the instant Complaint against said Defendant-Employer with claims of discrimination based upon race, color (white), gender (female), and ethnicity/national origin (Syrian/Lebanese), and retaliation.

**Background Facts**

4. On or about May 4, 2009, PLAINTIFF was hired on a part-time basis by Defendant-Employer as a part-time faculty.

5. As a part-time employee, PLAINTIFF consistently had courses, teaching approximately 225 students per year. She was paid compensation at a rate of $135.00 per student that enrolled in her courses.

6. At the time of her hire, PLAINTIFF had an impeccable educational background and work experience.

7. At the time of her hire, PLAINTIFF reported to the Dean, who was an Indian male named Dan Benjamin, and a white female of Lebanese decent named Irena Kageorgis.

**Plaintiff's Exceptional Performance**

8. Throughout her employment with Defendant-Employer, PLAINTIFF has received multiple exemplary annual evaluations, including but not limited to receiving the award of Outstanding New Faculty of the Year in 2010.

9. In approximately a two-year period of time, due to exceptional performance, PLAINTIFF was promoted to full-time. After her promotion to full-time, PLAINTIFF taught an average of approximately 475 students per year.

10. During her initial years, PLAINTIFF was given the responsibility of developing five courses for the university. She also published various articles with the Dean, made numerous presentations at conferences (Nuclear Regulatory Commission, Department of Energy, etc.), wrote the cyber harassment and bullying policy for the university, and various other tasks.

**Plaintiff's Work Performance Leads to an Offer of Promotion**

11. From the date of her hire in May 2009 to January 2017, PLAINTIFF had exceptional work performance and no disciplinary history. In fact, in May 2016, PLAINTIFF was contacted by both Dan Benjamin and Irena Kageorgis to be the Cyber Security Program Director.

12. After going through the motions of submitting an updated CV and being interviewed, PLAINTIFF was offered the position. It was made clear to PLAINTIFF that her acceptance of the position was contingent upon her leaving her other job at Robert Morris University. For this reason, PLAINTIFF declined the position at that time.

### Plaintiff's New Reporting Requirements

13. On or about the beginning of 2017, PLAINTIFF'S reporting requirements changed from reporting to the Dean and Irena Kageorgis, Program Director to reporting to four men, three of which were black, including Ken Williams (black male), Kevin Harris (black male), Elliott Lynn (black male), and Jackie Galvin (white male).

14. Irena Kageorgis, who PLAINTIFF had reported to since 2009, is a white female of Lebanese descent.

15. On or about August 2017, Kageorgis was demoted from Program Director to faculty and replaced by said four men.

16. At the time of her demotion, Kageorgis was expected to be the program director of cybersecurity and other information technology areas, teach classes, conduct her administrative duties, and prepare to file for the University to be designated as a Cyber Center of Academic Excellence (hereinafter "CCAE") through the department of Homeland Security.

17. Eventually, Kageorgis was terminated in October 2017, and her duties were divided among the four men who replaced her.

### Plaintiff Deprived of an Opportunity as Program Director

18. While Kageorgis had to conduct all of her daily tasks as Program Director as well as complete the work required for the CCAE, Ken Williams, the new Program Director of Cybersecurity was put on special project to devote his full time and attention to the CCAE.

19. On or about April 2017 Defendant-Employer hired Elliot Lynn (black male) to conduct Williams duties as Program Director during the time of his absence handling the CCAE.

20. Although PLAINTIFF was qualified for the Program Director position in 2016 under Dan Benjamin and Irena Kageorgis, Defendant-Employer never provided any notice to PLAINTIFF that a position for interim Program Director was available.

21. Defendant-Employer discriminated against PLAINTIFF, depriving her of the opportunity to apply for said position as the more qualified employee. Instead, Defendant-Employer showed unwarranted favoritism of an African-American male employee. In fact, PLAINTIFF has received numerous complaints from students about Elliot Lynn that strongly supports that she was the better person for the position.

22. In addition to Williams' special assignment, Program Director Novadean Watson, who is an African American woman, was also put on special assignment for a project, yet they did not extend the same courtesy to Irena Kageorgis.

23. In addition to the African American men and women being treated differently than Irena Kageorgis, Defendant-Employer hired another African American male assistant to help Novadean. Kageorgis was not afforded the opportunity of having a support staff assisting her with her duties.

24. Two program directors were given special accommodations, yet they were not given to Kageorgis, and she was demoted and ultimately fired in 2017.

### Tension Between Plaintiff and Ken Williams

25. Immediately after the change in reporting, PLAINTIFF experienced tension between her and Ken Williams. From the start, Ken Williams always talked down to PLAINTIFF. He spoke to her as if she was a new employee with no skills.

26. In seven months, PLAINTIFF received more phone calls from Ken Williams checking on her work status or needing her to complete various tasks than she did in almost eight plus (8+) years working under Irena Kageorgis and Dan Benjamin.

### Williams Changes Plaintiff's Courses

27. As part of PLAINTIFF'S 2017 work order she was given the task of developing a new course titled Wireless and Mobile Device Security and redevelopment of a course titled Advanced Cybercrime Analysis. As part of, PLAINTIFF was required to turn in weekly status reports.

28. After weeks of sending in the required reports as to Wireless and Mobile Device Security class, Williams unilaterally and without any advance warning changed the course that she was to develop from Wireless and Mobile Device Security to Intrusion, Detection and Incident Handling.

29. PLAINTIFF immediately voiced her opposition to this action by Williams, stating that she was not qualified to develop that course. Williams responded that she had no choice because her original course was not needed. This statement was completely false as facts would thereafter reveal.

30. PLAINTIFF continued to consistently voice her concerns and objections to the new course to not only Williams, but also Elliot Lynn and Jack Galvin.

4

**Williams Sets Plaintiff Up for a Fall**

31.     On July 11, 2017, at approximately 2:09 pm, PLAINTIFF received a call from Williams.  At this point, PLAINTIFF was supposed to be reporting to Elliot Lynn, yet Williams once again felt the need to call her.   PLAINTIFF returned his call a few minutes later at which time he stated, "did you see my email?"  After PLAINTIFF asked when he sent the email, he responded, "five minutes ago."

32.     PLAINTIFF had not seen the email, nonetheless, Williams stated that PLAINTIFF had a report titled "OER Report" due by 5:00 pm that same day.

33.     PLAINTIFF was not given any advance notice of this report, and she knew nothing about an OER Report and/or its scope, content and requirements; nonetheless, she had to complete the report on the development of a course for which she had no skills by 5:00 pm.  PLAINTIFF would learn that this report was now due every Tuesday.

34.     PLAINTIFF continued unsuccessfully to reach out to other management for support and information about the report and/or its requirements.

35.     In the interim, PLAINTIFF had weekly calls with Elliot in which she continued to tell him that she did not have the skills to develop the course and that she was concerned that she would be fired if she did not complete it correctly.  Elliot responded, "Not to worry.  Just do as you are told and you will be fine.  There are only a few of us with our full-time status so just do as you are told."

36.     PLAINTIFF saw the remarks as a thinly veiled threat.  In fact, Kageorgis told PLAINTIFF that they were out to get her and were setting her up to be fired.

37.     PLAINTIFF feared losing her job - every call that she had with Harris, Williams and Lynn, she would constantly say, "Am I being fired?"

**Plaintiff's Report to HR**

38.     In July 2018, PLAINTIFF called and emailed Wendy Anson, the Director of Human Resources to discuss the situation.  In her report to HR, PLAINTIFF stated that she felt subject to discrimination based upon gender, national origin and color.

39.     PLAINTIFF discussed with Anson how she was treated, and the fact that she never was treated that way under Kageorgis.  PLAINTIFF also discussed the fact that she felt that they were setting me up and reiterated it as often as she could.  She explained that she never had this

problem under the female Program Directors but now she had problems of unequal treatment under four male authority figures, three of which are African American directors.

40. Out of utmost prudence and caution, PLAINTIFF sent all of the email communications that she had with Galvin, Williams and Lynn to Anson.

41. When Dan Welsch, the Interim Dean, contacted PLAINTIFF to discuss the OER Report, PLAINTIFF made a similar report of harassment and discrimination to Welsch. She also forwarded all email communications to Welsch.

42. Welsch seemed genuinely concerned about her report. He called 24 hours later on August 8, 2017 and told PLAINTIFF that he spoke with Kenneth Williams, Elliott Lynn, Jack Galvin and Kevin Harris. He stated that he was furious that everyone ignored PLAINTIFF'S concerns verbally and written.

### Plaintiff's Reporting is Changed to Harris

43. Changes would immediately occur after reporting to Welsch.

44. Welsch advised PLAINTIFF that she would no longer report to Elliott Lynn and Kenneth Williams. He stated that after speaking with them, it appeared her knowledge area was better aligned with Kevin Harris' courses.

45. Although Kevin Harris never gave PLAINTIFF any problems, this statement that she would fall within courses under Harris turned out to be **false** since the courses given to PLAINTIFF still fell within Williams' list of courses.

46. In a faculty meeting in January 2017, Jack Galvin provided a list of courses mapping to each program director and listing who one reports to for each course. According to Welsch, PLAINTIFF was moved from under Ken Williams to Kevin Harris because her skillset did not fall under his area, yet, in the meeting where they showed the list of courses by program director, ALL of the courses PLAINTIFF taught fell under Williams.

47. Despite Welsch's apparent concern over PLAINTIFF'S situation, neither Welsh nor Wendy Anson opened a Title IX investigation based on PLAINTIFF'S allegations.

48. The university even holds training that all employees are required to take based on Title IX and harassment.

49. As of August 9, 2017, PLAINTIFF began to report to Kevin Harris. Additionally, the course that PLAINTIFF was forced to develop was removed immediately. She no longer was required to develop the course.

## The Fix is In

50. Around November 13, 2017, PLAINTIFF received an email from Jackie Galvin stating that he needed to talk to her immediately.

51. In almost every call PLAINTIFF received over the course of 2017 from Galvin he always had someone on the phone to verify what they had spoken about.

52. PLAINTIFF arranged a phone call for later that day at which time Jack Galvin stated the following, "An employee at APUS ran into an employee at RMU at a conference." Galvin never told PLAINTIFF who either person was that he was talking about. He never specified the name of the conference either.

53. Galvin added, "This employee informed us that you work full-time at another University. Is this true?"

54. PLAINTIFF responded that it was true and that APUS knew she worked at another university. As mentioned above, PLAINTIFF had previously been told that she had to leave RMU if she wanted the Program Director position in 2016.

55. At all times relevant and material, Defendant-Employer had known about PLAINTIFF'S full time work at RMU, and it was never a problem during her employment at APUS until now with her working under the four men.

56. PLAINTIFF has documentation, which she had provided to the University showing that she was at conferences being paid for by APUS where she made presentations on behalf of both APUS and RMU. PLAINTIFF has witnesses from RMU that will testify to this fact. She can produce the publications, conference schedules and reimbursements from APUS.

57. PLAINTIFF never thought it was a problem because Dan Benjamin was a partner in EdVancements, an online education company where PLAINTIFF and Diane Barrett worked for him. Dr. Karen Powell, the President of APUS consulted with other universities. It was never a problem and PLAINTIFF'S other employment never got in the way of her APUS work. APUS knew from when PLAINTIFF started that she was also at RMU.

58. On November 30, 2017, PLAINTIFF had a conference call set up to talk with Jack Galvin and Danny Welsch. They were on speaker phone in her car, and she had a witness that heard the entire conversation. She was asked to choose between full-time status at APUS and RMU.

59. PLAINTIFF responded that she chose RMU because the salary is higher.

60. With that being said, PLAINTIFF carried APUS health benefits. That was a huge concern for PLAINTIFF.

61. To further distress PLAINTIFF, she was told to send an email to Jackie Galvin telling him that she was voluntarily stepping down to part-time faculty. That is part-time faculty with no benefits.

62. PLAINTIFF sent the email only because she did not want to lose all of her salary.

63. As a result of Defendant-Employer's actions, PLAINTIFF had a $70,000 salary plus health benefits at APUS. Thereafter, she made less than $20,000 with no benefits. She is forced to carry COBRA right now from the University paying over $600.00 per month.

64. Incidentally, Novadean Watson, the black female Program Director works full-time and that does not seem to matter to the University.

65. Following her forced demotion to part-time faculty without benefits, PLAINTIFF started to figure out which conferences were being held at the beginning of November that someone from both Universities would attend. She would subsequently figure out that the National Initiative for Cybersecurity Education (NICE) Conference was held on November 7th and 8th in Dayton Ohio. She was forced to put two and two together since neither Jackie Galvin nor Danny Welsch would tell her the source of the information.

66. PLAINTIFF would discover that the only person from RMU that would have attended this conference was Dr. Ping Wang. With that being said, PLAINTIFF asked Dr. Wang if he met anyone from APUS at the conference.

67. Low and behold, PLAINTIFF said that he met Kenneth Williams, and that Ken even went to dinner with him. To think, there were over 300 people there and Kenneth Williams found the only RMU person at the conference. Apparently, Williams asked a ton of probing questions about PLAINTIFF to Dr. Ping Wang and then reported them back to APUS.

68. This is the same black male, that had started harassing PLAINTIFF. He also is the same person that from under and placed under someone else, the same male that had a grudge against me because he was reprimanded by the Interim Dean.

69. PLAINTIFF lost full-time status because Kenneth Williams had a problem with her from the beginning, and ultimately arranged and carried out his plan to set her up and demote her. This was consistent to what PLAINTIFF had heard from the beginning of his employment from Irena Kageorgis.

### Plaintiff's Original Course Returned

70. In January of 2018, PLAINTIFF was asked by Kevin Harris to develop ISSC415. This was the course that Kenneth Williams originally told her was not needed, and then they were forcing her to try to develop the course (ISSC642).

71. The course that she was given to start the harassment was not needed after all indicating that it was all part of a big facade.

72. The course she developed (ISSC415) which launched in July 2018.

### Plaintiff's Remaining Courses Systematically Removed

73. In May of 2018, PLAINTIFF'S courses started to be reassigned.

74. PLAINTIFF reached out to her Program Director, Kevin Harris, and she told him that she was concerned.

75. In an email to Harris, she explained her concerns and indicated that after being forced to step down and lose more than half of her salary, she was having courses that she had been teaching for over nine (9) years removed from her.

76. Since losing her full-time status, PLAINTIFF'S courses have been systematically removed to the point where she barely has been given courses. She realizes that she is being constructively discharged and/or retaliated against.

77. While it is true that courses go to full-time faculty first, PLAINTIFF'S full-time position has yet to be filled so it is not as if the Defendant-Employer reassigned the courses to another full-time faculty. Rather, PLAINTIFF was the only full-time faculty teaching those courses.

78. Since she started in 2009, PLAINTIFF consistently had courses. As part time, she always taught approximately 225 students per year. Faculty at APUS get paid by student.

79. Prior to becoming full-time, PLAINTIFF always was scheduled at capacity. Even her part-time teaching load has now been affected.

80. Once PLAINTIFF went full-time, she taught approximately 475 students per year. She is now forced back to part-time status, and she has taught approximately 60 students as of June 2018.

81. Defendant-Employer's demotion to part time followed by the systematic removal of her courses has amounted to a constructive discharge of PLAINTIFF.

**Baseless Ethics Complaint Filed by Defendant to Interfere with Plaintiff at RMU**

82. On or about October 2019, a complaint/report was filed against Plaintiff at Robert Morris University where Plaintiff still maintains full time employment.

83. The report provided a link to Plaintiff's online profile with Defendant and threatened Robert Morris that they would turn the university in to accrediting boards for letting Plaintiff teach for both Defendant and Robert Morris University.

84. There was additional threatening language in the report.

85. The timing and circumstances of the filing of the report reveal that the report was filed by and/or at the direction of management of Defendant.

86. The report, which was just the most recent event in a history of events creating a hostile work environment for Plaintiff as delineated in the paragraphs above, is nothing more than a brazen and intentional attempt to interfere with Plaintiff's employment with Robert Morris University.

**Severe Distress**

87. Due to the retaliatory actions of said individuals above, PLAINTIFF has suffered severe emotional distress from her demotion from full-time and the systematic removal of her remaining courses.

**COUNT I – GENDER, RACE/COLOR AND NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e**

88. Plaintiff incorporates paragraphs 1 through 88 as if fully set forth herein.

89. PLAINTIFF, who is a white, Lebanese/Syrian female, is a member of protected classes.

90. Defendant-Employers discriminated against PLAINTIFF in the terms, conditions and privileges of her employment because of her gender, national origin, race and color, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e.

91. Defendant-Employer's during a continuous period of multiple years engaged in conduct toward Plaintiff which created a hostile work environment. The harassing conduct was severe and/or pervasive and interfered with her resulted in a violation of her federal rights under Title VII.

92. PLAINTIFF was subject to adverse employment action, including a forced demotion, whereby she was demoted to part-time faculty, and the systematic removal of her

remaining courses.

93. Defendant-Employer's violation of the Civil Rights Act was undertaken with malice or reckless indifference to her federally protected right to not be discriminated against because of her gender, national origin, race and/or color.

94. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment of PLAINTIFF, she has suffered pecuniary losses including in the form of lost pay, wages and benefits, overtime, holiday pay, clothing allowance, vacation, sick and personal days, medical benefits, dental and vision benefits.

95. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment of PLAINTIFF, she has suffered extreme emotional distress, depression, stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses.

### COUNT II – RETALIATION IN VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e-3(a)

96. Paragraphs 1 through 96 are incorporated herein as if fully set forth.

97. It is an unlawful employment practice for an employer to discriminate against any employees because they have opposed any practice that's an unlawful employment practice under Title VII, 42 U.S.C. §2000e-3(a).

98. Defendant-Employer retaliated and/or discriminated against PLAINTIFF in the terms, conditions and privileges of her employment because of her opposition to discrimination by Ken Williams, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a).

99. Defendant-Employer's violation of Title VII was undertaken with malice or reckless indifference to her federally protected right to not be retaliated against due to her opposition to discrimination and retaliation.

100. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment of PLAINTIFF, which includes her constructive discharge by her forced demotion and removal of courses, PLAINTIFF has suffered or believes she will suffer pecuniary losses including in the form of lost pay, wages and benefits, overtime, holiday pay, clothing allowance, vacation, sick and personal days, medical benefits, dental and vision benefits.

101. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment of PLAINTIFF, PLAINTIFF has suffered emotional pain, suffering, inconvenience, mental anguish, embarrassment, loss of enjoyment of life, and other non-pecuniary losses.

102. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment of PLAINTIFF, PLAINTIFF had suffered severe emotional distress and an inability to sleep at nights, which PLAINTIFF was forced to get prescriptions to control.

### COUNT III – VIOLATIONS OF PENNSYLVANIA HUMAN RELATIONS ACT
### 43 P.S. §951-963

103. Paragraphs 1 through 103 are incorporated herein as if fully set forth herein.

104. PLAINTIFF, as an individual who is white, Syrian/Lebanese female at the time of the incidents in question, is a member of protected classes.

105. Defendant-Employer discriminated against PLAINTIFF in the terms, conditions and privileges of her employment because of her race, color, gender, and national origin/ethnicity in violation of the Pennsylvania Human Relations Act ("PHRA").

106. PLAINTIFF was subject to adverse employment action, including an unwarranted demotion.

107. Additionally, PLAINTIFF was engaged in a protected activity when she complained to management and/or Human Resources about discrimination.

108. Defendant-Employer discriminated against PLAINTIFF in the terms, conditions and privileges of her employment in retaliation for her engaging in said protected activity, in violation of the Pennsylvania Human Relations Act ("PHRA").

109. Defendant-Employer's during a continuous period of multiple years engaged in conduct toward Plaintiff which created a hostile work environment. The harassing conduct was severe and/or pervasive and interfered with her resulted in a violation of her state rights under the PHRA.

110. Defendant-Employer's violation of PHRA was undertaken with malice or reckless indifference to her state protected right to not be discriminated against because of her protected status.

111. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment of PLAINTIFF, PLAINTIFF has suffered or believes she will suffer pecuniary losses including in the form of lost pay, wages and benefits, overtime, holiday pay, clothing allowance, vacation, sick and personal days, medical benefits, dental and vision benefits.

112. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment, she has suffered extreme emotional distress, depression, stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses.

## COUNT IV – VIOLATIONS OF WEST VIRGINIA HUMAN RIGHTS ACT

113. Paragraphs 1 through 113 are incorporated herein as if fully set forth herein.

114. PLAINTIFF, as an individual who is a white, Syrian/Lebanese female at the time of the incidents in question, is a member of protected classes.

115. Defendant-Employer discriminated against PLAINTIFF in the terms, conditions and privileges of her employment because of her race, color, gender, and national origin/ethnicity in violation of the West Virginia Human Rights Act ("WVHRA").

116. Defendant-Employer's during a continuous period of multiple years engaged in conduct toward Plaintiff which created a hostile work environment. The harassing conduct was severe and/or pervasive and interfered with her resulted in a violation of her state rights under the WVHRA.

117. PLAINTIFF was subject to adverse employment action, including an unwarranted demotion.

118. Additionally, PLAINTIFF was engaged in a protected activity when she complained to management and/or Human Resources about discrimination.

119. Defendant-Employer discriminated against PLAINTIFF in the terms, conditions and privileges of her employment in retaliation for her engaging in said protected activity, in violation of the West Virginia Human Rights Act ("WVHRA").

120. Defendant-Employer's violation of WVHRA was undertaken with malice or reckless indifference to her state protected right to not be discriminated against because of her protected status.

121. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment of PLAINTIFF, PLAINTIFF has suffered or believes she will suffer pecuniary losses including in the form of lost pay, wages and benefits, overtime, holiday pay, clothing allowance, vacation, sick and personal days, medical benefits, dental and vision benefits.

122. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory treatment, she has suffered extreme emotional distress, depression, stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE, PLAINTIFF respectfully demands as follows:

a. That the Court find that Defendant-Employer's actions are unlawful and in violation of Title VII of the Civil Rights Act;

b. That Defendant-Employer be ordered to reinstate PLAINTIFF to full-time faculty status effective from the date she was demoted with all benefits incident thereto, including but not limited to wages, benefits, training and seniority;

c. That Defendant-Employer be required to compensate PLAINTIFF for the full value of wages and benefits she would have received had it not been for Defendant-Employer's unlawful actions towards PLAINTIFF,

d. That Defendant-Employer provide PLAINTIFF reimbursement for lost pension, social security, experience, training opportunities and other benefits;

e. That Defendant-Employer provide any front-pay to the extent that reinstatement at full time is not possible;

f. That Defendant-Employer should pay PLAINTIFF compensation for all her pain and suffering, including the extreme emotional distress, depression, stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses that resulted from its improper discriminatory actions and /or retaliatory treatment of PLAINTIFF;

g. That PLAINTIFF be awarded exemplary and/or punitive damages due to Defendant-Employer's clear discriminatory conduct;

h. That PLAINTIFF be awarded against Defendant-Employer the costs and expenses of this COURT action and any further action, including all reasonable attorneys fee as provided by statutes;

i. That a final judgment in favor of PLAINTIFF and against Defendant-Employer be entered for liquidated damages in an amount that includes the amount of wages due and owing and all other damages as set forth above;

j. That Defendant-Employer be enjoined from discriminating against PLAINTIFF in any manner that violates her civil rights;

k. That PLAINTIFF is granted such further legal and equitable relief as the COURT may deem just and proper.

**JURY TRIAL IS DEMANDED**

Respectfully submitted,

/s/Dennis M. Moskal
Dennis M. Moskal, Esq./
PA I.D. # 80106

Law Offices of Dennis M. Moskal, LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
(412) 992.0948, Mobile
(412) 927.1147, Facsimile
dennis@harassment-doctor.com